Our first case today is number 19-309, John Kearney, Governor of Delaware v. James Adams. Mr. McConnell. Mr. Chief Justice, and may it please the Court. A fundamental feature of our system of federalism, recognized most clearly in Gregory v. Ashcroft, is that states have broad leeway in setting qualifications for their high-ranking officials, including their judges. Delaware has used that freedom to create a system, unique among the states, of constitutionally mandated political balance for its judiciary, with the result that Delaware's courts are widely regarded as the least partisan and most professional in the nation. The Third Circuit has upended that system based on an implausible reading of this Court's political patronage cases. Elrod and Branty expressly permit using political affiliation for appointments to high-level discretionary positions. But even if we're wrong about that, the Delaware provisions serve a compelling interest in creating a uniquely balanced and nonpartisan judiciary. Now to make matters worse, the Third Circuit invalidated the fair majority provision based solely on severability, despite having found that Mr. Adams has no standing to challenge that requirement. That analysis directly conflicts with both federal and state severability doctrines. There is no doubt whatsoever that the fair majority requirement can stand on its own. It stood on its own for more than 50 years, from 1897 to 1951. It stands on its own with respect to two of Delaware's five constitutional courts even today. There is not the slightest reason to believe that Delaware's constitutional drafters would eliminate the fair majority requirement if they knew the major party provision would be struck down. That said, both provisions of the Delaware Constitution passed muster under the First Amendment, and Mr. Adams, who passed up the chance to apply for a host of judgeships both before and after changing party affiliation, lacks standing to challenge either one. I look forward to your questions. Well, Mr. McConnell, I'd like to begin with the standing issue. Our cases, like Gratz in northeastern Florida, require that a plaintiff injured by being excluded from competing for a position need only establish that he's ready and able to apply for it. Don't you think he's ready and able? He shows by his actions that he may be able, but he isn't ready, and that there were numerous judgeships for which he was constitutionally eligible and didn't apply. It would be as if, in the contractor case, a suit was brought by somebody who had been offered a contract and just chose not to take it. Well, I don't think that's applicable. The contractor wants to enter into any contract he can to sell his goods, but just because Adams passed up some judgeships doesn't mean he's not interested in one that will become available or was available when the others were. Mr. Chief Justice, he testified in his deposition under oath that he was interested in all five courts. He was specifically asked all five of the courts, and his answer was yes. Well, he also said that he would consider and apply for the next available judicial position. He said that under oath at the summary judgment stage. What more does he have to do? Well, he did not, in fact, apply for the next available position, even when he was eligible for it. Is there anything else he has to do? He satisfies all of the qualifications. He seemed adamant about wanting a position. Actually, even his allegations have fallen very short of the concrete plans that this court requires in Lujan. His allegations have been vague in the extreme. He said he has desired and still desires a judgeship. That's from his amended complaint. He says that he would seriously consider and apply for a judgeship. That's from his answers to interrogatories. He never out and out says that he will apply for a judgeship if he becomes eligible. And I don't know how he could allege that anyway, given that there have been numerous judgeships for which he is eligible, and he has passed up most of those. If Mr. Adams is held to have standing here, I think anyone would have standing to challenge provisions of constitutions that they have academic disagreements with, simply by saying that they might want to take advantage of them at some point. Thank you, counsel. Thank you, counsel. Justice Thomas? Thank you, Chief Justice. Mr. McConnell, I'd like to just move to the merits briefly. I'd like to know how far you'd go with your argument. Could Delaware, for example, pass a law requiring all judges to be members of one or the other of the major parties? I don't think so, Your Honor. The test in both Gregory v. Ashcroft and in Branty and Elrod, which fit together very nicely, is that the qualifications have to be reasonably appropriate. I can't see under any circumstances that that requirement would be reasonably appropriate. Changing a little here, how would your argument be different, or this case be different, if, for example, your judges were elected and an independent was prevented from being on the ballot? Well, Justice Thomas, this court has a whole separate line of jurisprudence under the Equal Protection Clause having to do with elections, and those cases would apply. I think an up-and-out exclusion of an independent from being able to be put on the ballot violates not only that person's rights, but the voters' rights. But when a state does not subject a position to elections, but rather to appointment, those cases do not apply. Would your case be better or worse if this were not a matter of constitutional provision, but rather a matter of a tradition or a practice of longstanding? Under this court's precedence, I think it's the same, because the cases that the Third Circuit relied on, Elrod and Brantee and O'Hare and Rutan, all involve the exercise of appointment discretion by the appointing officer. And so if Mr. Adams is right here about the state constitution, it would seem to follow from those cases that he would have a right, even as to the executive. Now, he forswears that. He says that isn't his position, which I can understand, because it would fly in the face of longstanding and universal practice. So, of course, he doesn't want to admit that that's the logical implication of his position, but it is. And briefly, you've studied this area. Do you find any historical support for preventing states from imposing political qualifications? None at all. Thank you. Justice Breyer. Thank you. I'd like to return to Justice Thomas's first question. As I understand it, the Constitution says in respect to the Supreme Court, the Superior Court, and a number of other courts, not all, that you have some offices that are for the same major political party, but they can't be more than a bare majority. And then it says the remaining members shall be of the other major political party. So why isn't that just the problem that you said was a problem? If a majority or an even number are Democrats, the rest must be Republicans, and the Green Party need not apply. It can't. Justice Breyer, the reason for this is not to exclude independents or the Green Party, but rather as a necessary backstop to the bare majority requirement, because without it, it would be just too easy for the governor to name a political ally from an allied party. Take Mr. Adams as a great example of this, because he professes to be, after having been a lifelong Democrat, he professes to be a Bernie Sanders independent. So if there were already a Democratic majority on the court and the governor were able to name Mr. Adams, it would just fly in the face and frustrate the purposes of the political balance provision. I agree there might be a reason for it, but how do you get around the fact that the way that it's written and applied is you have to be a Republican or a Democrat, and there are other parties, period. And so why is that constitutional? Well, it's constitutional because it advances the state's compelling governmental interest in political balance on the courts, and there is no other provision that would achieve that purpose in a less restrictive way, or at least no one has identified it. I see your argument. And the other question I have is it is the case that the plaintiff in this case did apply or did say he would apply to become a judge in any court were it not for these requirements. Now, why isn't that good enough to give him standing? I mean, should we have a hearing, just decide to be sincere? Do you think he's insincere in that or what? Actually, I think that, first of all, this decided in his favor on motion for summary judgment. So the question is whether the trier of fact could, on this record, conclude that Mr. Adams does not have a serious interest in serving on the courts. And the fact that he could have applied for any number of positions, both before and after he changed his political affiliation, casts serious doubt on his sincerity. Thank you, counsel. Justice Alito? Mr. McConnell, what do you think is the minimum that Mr. Adams would have to allege in order to have standing? Suppose he looked up when the next vacancy would occur on any of the covered courts and said, I plan to apply for that position. Would that be sufficient? Justice Alito, I think so. His big problem is that his actions do not line up with his words. Now, it is true that even his words are vague and, I think, insufficient under this court's precedent in Lujan, which requires concrete plans. But what you describe probably would satisfy Lujan. The problem is I don't think he could swear to it, given that there have been so many judgeships for which he's entirely eligible that go by. Well, couldn't he say, in the past, I was equivocal about this, but now I've made up my mind. I want to be a judge, and a position will open up on this particular court on this particular date, and I plan to apply for that. Wouldn't that be enough? Well, not without taking back his sworn statement that he would be interested in serving on any of the five courts, because among those five courts, two of them are perfectly open to him. In fact, he has a better shot, legally speaking, on those two courts, because as an independent, he could never violate the bare majority requirement. But despite the fact that those openings have been numerous, he still brings the lawsuit. It seems evident that he's really interested here in pursuing a theory that he read about in a law review on not really getting a judgeship. On the merits, your answer to Justice Thomas about a hypothetical constitutional provision requiring that all of the judges on a particular court be members of a particular party was that that would not be reasonably appropriate, whereas the breakdown in the provision at issue here is reasonably appropriate. So if we hypothesize a court with nine members, at what point would the breakdown specified in the Constitution be inappropriate? Nine to nothing, presumably, would not be according to your prior answer, but what about eight to one, seven to two, six to three, five to four? At what point would something become not reasonably appropriate? I understood Justice Thomas' hypothetical to be that the court be entirely members of one party. I can't conceive what the legitimate governmental interest would be for that. But here, the state is doing something that's actually quite commonsensical, makes a great deal of sense if you believe in a bipartisan judiciary. And that's the difference here. It isn't numbers. It's whether the use of partisan affiliation is reasonably appropriate. Thank you. Thank you, counsel. Justice Sotomayor? Counsel, I just want to make sure I understand things. You used the word bipartisan, but in your briefs, you said that this provision, the majority party provision, promotes partisan balancing. And the public's perception of an independent judiciary. I just don't understand why the majority party rule promotes either of those two interests and does it in a better way than the bare majority provision at issue in your section, in your number two of Article Three. There, all that is required of the bare majority is that it be no more than a bare majority. It doesn't have to be. But could you explain to me why it has to be two parties only who can be judges? Justice Sotomayor? And to promote those particular interests, because that's the state's interest. So the state's interest is in balance. And what the major party provision does is it prevents a governor from appointing somebody from an allied party, a party that's very closely associated with one of the two major parties, or an independent who may have been a member of the other major party, as, of course, Mr. Adams was for his entire career. So this is really a backstop provision to make sure that the bare majority provision works. Well, if you excuse me a moment with that, those two examples, seems to me that no rightly thinking governor is going to appoint someone from the other party who is completely misaligned with his or her views. They could pick the most, I don't know if there's such a word, the softest Republican, the one most closely aligned with democratic values or something of that nature. It just doesn't seem to me that the mere membership in a party connotes an acceptance by a governor. Well, Justice Sotomayor, this is really a question of experience and reality. And political party in this country is, it's universally used by political scientists as the proxy for a philosophy and ideology. And it's especially true now in the last 20 or 30 years when the two parties have been through what they call partisan sorting. So that today, the most liberal Republican is at least similar to, but probably more conservative than the most conservative Democrat. Thank you, Counsel. Justice Kagan? Good morning, Mr. McConnell. If I could go back to the standing questions that you've been answering. As I understood your answers, you said two things. One was that Mr. Adams never out and out said he was going to apply. And the second was that in fact he didn't apply on numerous occasions. So as to the first, I mean, this is his deposition testimony. I think that the Chief Justice referred to this. He said, I would apply for any judicial position that I thought I was qualified for. And I believe I'm qualified for any position that would come up. So isn't he, you know, he out and out says he wants a judicial position, isn't he? He said it certainly falls short of a concrete plan as required by Lujan. But I think his big problem is that... If I could just stop you there. Why does it fall short of a concrete plan? He's basically saying, I would apply for any judicial position that would come up. That's what he says. That's a concrete plan. I would apply for any judicial position that would come up. Of course, he hasn't followed through on that on many occasions, which I think... Okay, so that's your second argument, Mr. McConnell. But as to that, I mean, isn't the answer that it would be completely futile to apply? I mean, as long as this constitutional provision is in effect and he's an independent, he's not going to get a position. So why would we insist that he have to file an application? Justice Kagan, that's just not so. Of the five constitutional courts, two of them do not have a major party provision, and he's eligible for every single vacancy on those courts. Well, if he had said what I'm interested in is the three that have both the provisions, the major party as well, would he have to apply? Probably not, but that isn't what he said, and we have to judge this case according to the case that he has brought to us. I guess this seems a lot to me like the cases where we've said, you know, when somebody challenges an admissions policy, you know, in Gratz, in BACI, things like that, we're not going to make you file the application. We're certainly not going to judge what the likelihood of somebody thinking that the application is meritorious is. As long as this policy remains in effect, you can just challenge the policy. But the problem here is that he could apply and he would be eligible, and he has stated that he's interested in any of the five courts. He doesn't apparently care which ones. It would be as if somebody said, I want to go to any public university in Texas, but I haven't applied to any of them, and one of them, I think there's an obstacle. Thank you, counsel. Justice Gorsuch? Thank you. Mr. McConnell, I'd like to return to the question of the historical pedigree of these requirements. I understand your argument that there are a great many bare majority requirements across country and across time. How about with respect to the major party requirement? What analogs do you have for that? Justice Gorsuch, as far as I know, the Delaware Constitutional Convention of 1896 was an innovator. I think it was the first state constitutional provision or even analog. There were a couple of small statutes having to do with elections prior to that, but I think it was, in fact, an analog. But there are certainly no examples in history of provisions of this sort being regarded as unconstitutional. In fact, for most of the jurisprudence… Let me interrupt you there, and I'm sorry for doing so, but with our limited time, that's what I thought the answer would be, and that raises for me the following question, and that's the reason for the first question. The major party provision prohibits independence from serving as judges. That's quite a sweeping rule, and as I understand you, you've indicated that you'd agree that that violates the Equal Protection Clause as applied to elected positions, but you indicate that it's somehow very different with respect to appointed positions. And I guess I'm not clear why, given the absence of any historically rooted tradition along these lines with respect to the major party requirement. I understand your argument that it serves as a backstop for the bare majority rule, which does have historical antecedents, plenty of them, but near as I can tell, none of those has ever included this backstop before. This is a novel thing, and it does prohibit a great percentage of the population from participating in the process. Justice Gorsuch, may I make two points about this? First, although I can't point to a specific use of this particular matter, this Court has approved any number of limitations on First Amendment rights as a condition to public service. The Hatch Act cases, for example, are a much more severe limitation on free speech rights, and applying to lots more people for lots more positions, and the Court has consistently upheld them. But secondly, as to the uniqueness here, this actually, I think, points in Delaware's favor. It is true that Delaware is the only state that does this, but it is also the only state that has created a judiciary of the particular sort that is there. It's like the Delaware judiciary is a jewel. Justice Kavanaugh? Thank you, Mr. Chief Justice, and good morning, Mr. McConnell. I would pick up on standing from the comments and questions of the Chief Justice and Justice Kagan. You keep saying he hasn't applied. Of course he hasn't applied. He's not eligible, and that's the point. He says, once I'm eligible, I will apply, and I took your answer to Justice Kagan then to be, well, he's applying to too many courts, and I guess I don't understand why, if he says, I'm interested in any of three or four different courts, that defeats his intent to apply for standing purposes. Well, Justice Kavanaugh, when he says he's interested in any of the five courts, and there are positions for which he is eligible, constitutionally eligible, on some of those courts, it indicates that his actions, at least, do not conform to his words. Well, he's not eligible because he's not a Republican or Democrat. He is eligible for two of the five courts, including the one for which his qualifications would seem to be the best match, namely the family court. On the merits question, can a state exclude Republicans and Democrats from being judges and allow only independents to be judges? Justice Kavanaugh, I've thought about that, and I think it's a difficult question. I can't answer that a definite no. I think it is not impossible that a state has the constitutional authority under Gregory v. Ashcroft and other cases to say that judges simply may not be registered members of any party. Why can't, to pick up on Justice Sotomayor's question, why can't independents even better serve the goal of a balanced judiciary, nonpartisan, bipartisan judiciary? This provision is not really about whether independents can do a good job as judges. It's about governors and whom they can apply, and the limitation applies to the governor. It's a separation of powers type provision. If a governor simply used his discretion to balance the courts, nobody would even bat an eyelash, obviously constitutional. It's very odd to say that the Constitution cannot direct the governor in his exercise of discretion, but it's the governor who might very well name a supposed independent who is in fact an ally of his party, and that's what this provision is arguing against. Well, I guess there's a mismatch, arguably, between the state's interest and excluding independents altogether from being judges because independents could certainly, wouldn't you agree that independents could serve the purpose of achieving a balanced, nonpartisan, or bipartisan judiciary? Absolutely, but giving governors the discretion to name independents or allied parties would frustrate the purpose of the provision. It doesn't make it impossible. I'm not saying it's an essential backstop, just that it is a valuable backstop. Thank you, Mr. McConnell. Mr. McConnell, why don't you take a minute to wrap up? Thank you. The framers of the Delaware Constitution had lived through domination of the courts by one party and then by the other. On the basis of that experience, they resolved that a bipartisan bench would bring about, and I quote, a fuller and freer discussion of the matters that come before them and lead to fair and impartial decisions. In other words, they wanted the judiciary to remain stable, balanced, and nonpartisan, even when elections go all for one party for a period of time. Now, their decision has survived the test of fire. For the last 27 years, one party has held both the governorship and the Senate in Delaware, but the courts have remained balanced and nonpartisan. That is a remarkable achievement. We may not be able to prove with scientific precision that Article IV, Section 3 is the cause, but we don't want to risk it. States all over the country use partisan affiliation as part of judicial selection. With partisan elections and partisan appointments, Delaware should be able to use partisan affiliation to bring political balance. Thank you. Thank you, counsel. Mr. Finger? Mr. Chief Justice, and may it please the Court. Delaware's Constitution denies Mr. Adams the opportunity to apply for a judgeship because he does not belong to a major political party. The language political party excludes unaffiliated voters. The Delaware Code provides that unaffiliated and independent voters are voters without a political party. If one severs the phrase political party from the provisions, then the text becomes incoherent and does not achieve its desired goal. The petitioner is really asking this Court to rewrite the provisions under the guise of severance, and that should be left to the Delaware legislature. This phrase of political party affects all the issues before the Court. A party who suffers unequal treatment has standing to challenge a discriminatory exception that favors others. As long as judicial seats are allocated exclusively to political parties, unaffiliated lawyers are categorically excluded. The petitioner's arguments, at least in their brief, are based on the assumption that a judge's political affiliation is determinative of how that judge will vote in a case. And this Court can look to its own history as a refutation of that premise. If this Court accepts the premise, it's the end of the idea of an independent judiciary. And if this Court rejects the premise, then, irrespective of the standard of review, the challenge provisions must fall. Judicial engineering to avoid extremism in judging is not an interest that overcomes the First Amendment, and there's no evidence that political discrimination has had any beneficial effect on the quality of justice in Delaware. Merely repeating that it has doesn't make it so. For these reasons, this Court should affirm the decision of the Third Circuit. Thank you. Counsel, your client said that he would apply, was interested in serving as a judge on any court, and yet there were several opportunities for him to apply to judgeships for which he was qualified, and he didn't do it. So why shouldn't we not take his standing assertions as serious? Well, again, his statements seem to be made in good faith. He did want to apply, and he didn't feel that he could not at the time. He may have been an heiress to these two minor courts, but we shouldn't ghettoize it and say he has to apply only to these lower courts when there are these other courts that he wants to be on as well. Yeah, but he did say that he would be interested in a judgeship on any of the courts. He did say that, Chief Justice, but there are a number of factors which are outside the record, and I can't say I even know them, which affect a decision at one time. He does want to. There may have been intervening factors that prevented him from doing that. But nonetheless, the jurisprudence of this court has been that it's not a concrete step point, that folks from Lujan, but the fact that unlawful conduct impedes the ability to undertake the action that determines the standing. Well, the strongest statement he has is that he would consider and apply for the job. Now, if I got an application for a clerkship from someone who said she would consider and apply for the job, I really wouldn't know what to make of that. Well, it might be in the context where there's no restriction on your decision making in terms of whether to accept the client or to follow up with an interview. He can't, for at least three of the five courts, he can't even apply. Or he can apply, but what's the point? Counsel, in their opening brief, Mr. McConnell emphasized our decision in Williams-Yu Lee and in his reply brief as well. You don't cite that case at all in your brief, if I'm remembering correctly, and I wondered what your response was to their reliance on it. The Williams case, again, the court in that case did apply the heightened standard of judicial review. Again, the problem with that case and the Hatch Act type cases is those are cases involving conduct, not merely thought. Restrictions on the ability of a judge to do something or a political employee to do something which reflects a political judgment. In this case, it is a question of political thought. No one expects a judge, no matter what their political persuasion, to come out and advocate in the role of a judge for a particular political party. Those cases are distinguished from this case. Thank you, Counsel. Justice Thomas? Thank you, Mr. Chief Justice. Mr. Finger, in Lujan, we said that a petitioner's someday intentions really were not sufficiently concrete to amount to an injury. This looks, and his intentions of someday doing something did not amount to an injury. This looks much like that. Would you tell me how this differs from the problem that we had in Lujan? Certainly, Justice Thomas. I point to the Friends of the Earth v. Laidlaw decision of this court in 2000, which distinguished the Lujan case, saying that a statement that someone would take action but for unlawful conduct goes beyond mere someday intentions. How is this unlawful? I mean, I thought that in Laidlaw there was at least some sanctions involved. What would be the sanction against a respondent here? The sanction would be the denial of the opportunity. And what was it in Laidlaw? In Laidlaw, I don't recall that off the top of my head, Justice Thomas. Normally, I think when we think of a sanction, it's a penalty of some sort or a criminal sanction. Let me ask you this. If you don't need anything more concrete than his indication that he would have applied, how formal would that have to be, the announcement of his intention? Could he just say to a couple of friends at a cocktail party, oh, I think I would have applied for this job but for the fact that I'm not a Republican or a Democrat? Or does it have to be in writing? What does it have to be? That's a very good question. The question then becomes, going back to the Lujan case, the court uses the phrase concrete plan, but there's no interpretation of what constitutes a concrete plan. A statement under oath, as is in this case, that that was what was on his mind, absent some evidence that he is deliberately misleading or lying, should be accepted. What if he has a long history of saying, I'm going to do this and I'm going to do that, and never really gets around to doing it? Again, it would depend on the circumstances. As I said, there may be things that come up in one's life that interfere with a given opportunity. Nonetheless, if someone has a constant record of saying, I'm going to do this, and doesn't, then that is some evidence cutting against that person. Thank you. Justice Breyer? As I understand it, and correct me if I'm wrong, two of the five courts, he's perfectly eligible and always has been to apply for because you can be an independent. That's the Family Court and the Court of Common Pleas. So we're only thinking about the other three. Is that right? That's correct. Okay. So as to the other three, what should we do? There was a summary judgment motion. He said he wanted to apply to any court. Before he changed his party registration, he could have, since he was a Democrat, my clerk counted 16 openings that were on the other three courts he could have applied to. So here's a person who says any court. He could have applied before to any. He can apply now to two. Should we have a hearing on that? Or should we what? Let me respond first by saying, let's look at the timing of those openings. Mr. Adams testified that while he was working in the Department of Justice, while he was interested in the someday, at that point, he was very happy working with Attorney General Beau Biden and wasn't seeking actively a judgeship. It was only after he went into temporary retirement to rethink his position, and when he came back a year later in 2017 that he decided that a judgeship was his leading goal. And of those 16, most of them happened predated that point in time. Good. I knew you would have an answer to my argument. And that's why I was asking, should we have a hearing on it? Again, we send it back for a hearing so that the judges can listen and decide whether he was serious about this or not. Or just write it in a law review article. I think that for this reason, both the district court and the Third Circuit did not find a reason to infer that he was not sincere. Now, that goes to the question of whether it's a question of fact or question of law, whether the testimony and the evidence gives rise to any inference is a question of law. And the lower courts have found that the evidence presented, and both parties moved for summary judgment, so the state seemed to feel it was prepared. But the evidence they found did not rise to the level of creating an inference of insincerity. No, I know that, but sincerity is not the same thing as having a chance. And he could have had any chance he wanted to, and then there's the argument about the other three. That's one of the things I'm not certain about, whether sincerity is the answer to this. What do you think? If it's not sincerity, then very often in a case where someone says, I want to do something, but I can't. Doesn't mean he's hurt. If I sincerely want to go to the North Pole, nonetheless, I can't go. Yes. If there is a government-imposed impediment to that, and there's nothing that really rises to the level of challenging legitimacy of his intention, then we have achieved the standing requirement. Thank you, counsel. Justice Alito? Because this issue of standing was decided at summary judgment, we are required to look at the record in the late most favorable to your adversary. Isn't that so? That's correct. And as was previously mentioned, Mr. Adams' best statement about his plans appears to have been the statement that he would, quote, consider and apply for a future vacancy. Isn't that right? That's correct, Justice Alito. And if we view that in the late most favorable to the other side, can we say that means that he would actually apply? He said he would consider and apply. Yes. If the word apply was not there, it would be pure consideration. Consider and apply in the case of a positive affirmative action. Well, if you're going to apply, you're done considering. And if you're going to consider, you haven't made up your mind whether you're going to apply. Isn't that right? That certainly would be true. It's true in isolation. But when someone says, I will consider and apply, one can reasonably see that the person does have a goal in mind. If we say that the record does not support summary judgment on this, is there any reason for us to go on to the merits of the case? Wouldn't that be deciding a hypothetical case at that point? That would require the court to make a determination that his testimony was not sincere, not truthful. Let me turn to another matter. You applied for an injunction, and there was no ruling on that, was there? That's correct. We may have included a request for an injunction in the complaint, but we were basically seeking declaratory judgment. Have you withdrawn the request for an injunction? We've taken no action on the injunction issue. Is it still pending? No, it is not. The declaratory judgment action has the essential effect of an injunction in that it creates a rule of law that the state has to abide by. Why is that so? If the governor refuses to comply with the Third Circuit's decision, can he be held in contempt? I believe so. In contempt of the declaratory judgment? Yes, in contempt of the court's order instructing what must be done. On the merits, in just the couple seconds that are left, suppose there's no provision like this one, but the governor says, under no circumstances will I ever appoint to any judgeship a person registered as a member of the other party. From the standpoint of somebody who wants to apply for a judgeship, is there any difference between that situation and the situation here? No, because it becomes an effective unconstitutional policy of the governor. Thank you. Justice Sotomayor? Counsel, your last answer troubles me because there are three rights at issue here that I see, at least three. It's your right, your client's right, as an independent, to seek judicial appointment. And that right is being limited by this majority party rule. Then there's the governor's right, under Elrod and Branty, to decide who he wants to appoint to a certain position. And he could, maybe not this governor, but another governor might want an independent or another third party applicant, but the Constitution stops him from doing that. And that's where I think Elrod and Branty would have quite a lot to say about whether or not your political affiliations have much to do with your decision making. And that, I think, would be what we would have to face given Justice Alito's question, a governor who says, I won't appoint somebody from another party under any circumstance. But that's not the case here. The case here involves the state. And it's the state's choice, for its own interest, balancing partisanship and promoting an independent judiciary, who says, I want to prohibit both your client and the state and the governor from acting in a particular way, i.e., from selecting you merely because you're an independent. And it seems to me that the bare majority rule, that or prohibition in this case, is more than adequate to take care of those two interests. But the majority party rule isn't. But you're arguing against both. Can you tell me why you're saying we can't have severance? Certainly. As I indicated in my opening, Justice Sotomayor, the language of the provisions cannot be – you can't point to a phrase or term that will take out and remain coherent. And I'll just give the first example regarding the Delaware Supreme Court. The language says three of the five justices of the Supreme Court in office at the same time shall be – Counsel, I don't mean to stop you because I'm mostly interested in the second one. Take a look. All you have to do is take out the last proposition. The remaining members of such office shall be of the other major political party. And take out the word mayor. That's just excising a portion. But it still relegates independents and minor parties to the minority. It precludes – it neuters the influence of unaffiliated judges by diminishing the importance of their vote numerically. Thank you, Counsel. Justice Kagan? Good morning, Mr. Finger. I just want to make sure I understood your answer to Justice Alito. He said a governor comes in and he says, you know, I'm a Democrat and I'm committed to appointing only Democrats to the bench. They share my judicial philosophy. That's what I'm doing. You think that that would be unconstitutional? I think that would be – certainly, governors have the right to include political affiliation amongst the factors they consider. But if they are making a determination based on a classification without regard to individual merit, and a classification that is protected by the Constitution – Well, I'm sure that they're making decisions with regards to merit. There are lots of meritorious Democrats. But they're just saying, I'm not going to consider Republicans. I'm only going to consider Democrats. Or, alternatively, let's take another hypothetical. Suppose a governor comes in and says, I'm going to do – I like this Delaware scheme. We don't have one in my state. But I'm going to do exactly this. I'm going to make sure that there's only a fair majority and make sure that it's evenly divided between Democrats and Republicans. A governor couldn't do that either. There's no constitutional provision. There's no law. This is just a governor's view of good judicial appointment making. Again, this goes back to the communist cases and the question of communists need not apply, which we find is not acceptable under the First Amendment. It is simply a form of taking, as opposed to a written law. It is a decision of a government authority. And in those cases, if you're doing it just because you like it or just because you don't like someone of another political party, that is no different than having a law that says you cannot apply. So you don't think that there's any difference between the two, having a law from somebody else, whether it's the Constitution or the legislature passes it, on the one hand, and just it being a decision of the appointing authority. I believe that unwritten policies which violate the constitutional language are just as subject to a judicial attack as written ones. Okay. Let's assume that we do what you ask us to do and apply strict scrutiny or some form of heightened scrutiny. Why does this fail? I understood your principle argument to be that this was not the least restrictive alternative. So I guess my question is, what would be a less restrictive alternative? The less restrictive alternative already exists. It is in the Delaware Code of Judicial Conduct, which says that judges shall not consider political concerns in making their decisions. Well, doesn't that go to something very different? I mean, sure, that Code of Conduct is very important, and it makes sure that judges are ethical, but it doesn't do what this law tries to do, which is to say we want to create balanced courts. We want to do that both for the appearance of justice, that those courts won't look political, and we also want to do it because we think that those courts will make better decisions. They won't go to the extremes. They'll move to the center. There won't be polarization. There'll be compromise. I believe, for the second point, the question whether it is partisan, bipartisan, that is challengeable from the perspective of the public who could also say that by creating this political compromise, we are agreeing that judges are making political decisions. Thank you, counsel. Justice Gorsuch? Counsel, we've already discussed standing off a lot, but I just wanted to clear up one small thing that we didn't discuss, and that concerns the bare majority requirement. The Third Circuit held that your client had no standing to contest that because, as an independent, it doesn't preclude him from taking office in any judicial capacity. I did not see a cross-petition from you on that. I did see one or two straight sentences in your brief suggesting you contest that. I'd just like clarity now. Are you expecting us to rule on that, or do you concede that that issue is not before us? I believe that issue is not before the court. The Third Circuit did not pass on it, but merely relied on severance or the lack of severability. Counsel, thank you. If you agree it's not before us, that's great. That's all I needed to hear. With respect to the merits on Elrod and Bronte, I want you to react to this, the notion that they might be an odd fit here. They've been applied to protect the affiliation rights of what the court has called low-level employees in the executive branch. And they've also been there to ensure that patronage doesn't go too far. Here we have a requirement that doesn't concern the rights of affiliation necessarily and actually mitigates the problem of patronage by ensuring, as it has for the last, I guess, 27 years, that a governor has to pick a candidate from the opposite party. So, first of all, they seem kind of an odd fit. And then there's the overlay of the Tenth Amendment, which grants states considerable power to organize their own government, so long as they're Republican forms of government. And this court has repeatedly emphasized the importance of that right, Gregory v. Ashcroft. So, can you just react to those thoughts? Yes, Justice Gorsuch. Bronte is relevant in the extent that it creates a limited exception to what I'm calling the communist rule. It's the absolute bar on using political affiliation. And although I don't believe that those cases refer to it as limiting it to low-level employees, that's a characterization that was put in my opponent's brief. As for the Tenth Amendment, this court has also recognized that states' rights are still bounded by the Constitution of the United States. Thank you, counsel. Justice Kavanaugh. Thank you, Mr. Chief Justice. Good morning, Mr. Finger. Picking up on a question earlier from Justice Gorsuch, there is a long tradition of governors considering political affiliation when selecting judges. Delaware seems to just make explicit what has been implicit in many states that leave it to the governor. Why then, given that traditional practice matters in First Amendment analysis, why is that different in kind than governors considering political affiliation? Because, Justice Kavanaugh, it's not an exclusive fact. Taking the federal bench, just for example, since President Roosevelt, there has been approximately 5 to 10 percent of appointees coming from the other party. I take this from a law review article that appeared in the amicus brief of the former justice of the Delaware Supreme Court. That same law review article also shows that since President Carter, there's been an increase to about 5 percent of candidates' appointments. I'm sorry to interrupt. The problem is the categorical nature of Delaware's rule. I think I understand that. Mr. McConnell also identifies, I guess what I would describe as the leave well enough alone principle, that the results in Delaware have been superb with Judges Collins-Seitz, and Bill Allen, and Leo Strine, and Norm Veazey in leading lights of the judiciary. What's your response to that argument that it's produced an excellent, widely respected judiciary? Again, there's no evidence that this highly respected and properly recognized judiciary's excellence results from this provision. That's a case of a sort of illusory truth effect where a statement is made over and over, and people tend to believe it more, but there's nothing concrete to support that. It's not really even intuitive. Okay. Next question is, if you were to win here, what would happen to partisan balance requirements for federal independent agencies, state redistricting commissions, state judicial nominating commissions, and the like? Well, nothing should directly follow from that. These various agencies and commissions, they all have different interests involved. So a decision by this court will not per se do away with those requirements. Thank you, Mr. Finger. Thank you. Mr. Finger, why don't you take a minute to wrap up? Thank you. I thank the court for the opportunity. In conclusion, I just want to say the state's interest in the stability of its judicial system should not permit it to insulate the judiciary from independents or unaffiliated or members of major political parties. The goals are not met by the provisions, and the assumptions underlining them, as enforced in the brief, indicate that they are not achieving that goal solely on that basis. There are other factors in Delaware which create an excellent judiciary and will continue to do so without these limitations on the rights of people other than Democrats and Republicans. I thank the court. Thank you, counsel. Mr. McConnell, three minutes for rebuttal. Thank you very much, Mr. Chief Justice. I want to address a couple of small points and then the major one. In Justice Breyer's discussions both with me and with Mr. Finger, we talked about sincerity, and I even used the word sincerity, but I want to emphasize that the ultimate test here isn't whether Mr. Adams was sincere. The question is whether applying would be futile, and that's a question of fact. It's not a question of sincerity. Ultimately, the question is whether a trier of fact, reasonable trier of fact, could and have found on this record against Mr. Adams on the summary judgment motion. Now, the second small point that I would like to emphasize here is that severability, which we didn't discuss a great deal today, is of enormous practical importance because even if the major party provision were struck down, there is no justification for striking down the bare majority provision. It's especially clear because Mr. Adams does not even have standing to challenge that, and we know that it could stand on its own because it has for so many years, and it's of grave importance to the state that even if we were to lose on the major party provision, that the bare majority provision still stand. Finally, I want to turn to the merits, which is really what matters here. We believe that under Gregory v. Ashcroft, as well as Branty and Elrod, that strict scrutiny is not appropriate. The language used by the courts in the patronage cases all involve reasonableness. Is there a reasonable relation between the requirement? This is because it's basically an unconstitutional conditions case. What Mr. Adams is alleging is that he's being denied an available public benefit because of his exercise of a constitutional right, but that kind of an argument doesn't work if the restriction is germane to the purpose for which the benefit was created. So strict scrutiny should not apply, but even if it did apply, the question is whether the challenge provision serves a compelling governmental interest in the least restrictive way. And here, no one doubts that the state has a compelling interest in promoting public confidence in the judiciary. Now, the bare majority requirement may be sufficient to achieve that interest under normal circumstances where political parties seesaw back and forth, but the major party provision makes the bare majority provision more effective, especially under the actual circumstances here of long-time party domination. Thank you, counsel. Thank you. Thank you, counsel. The case is submitted.